## MARCY v. BOARD OF COMMISSIONERS OF SEMINOLE COUNTY *et al.*

No. 5553.   Opinion Filed November 24, 1914.

(144 Pac. 611.)

1.   INDIANS—Conveyance of Allotted Land—"Alienation"—"Restrictions on Alienation." The words "restrictions upon the alienation," as used in the Act of Congress of May 27, 1908, c. 199, 35 Stat. 312, means those restraints or limitations imposed by law upon the power of allottees of the Five Civilized Tribes and their heirs to voluntarily convey allotted lands free from supervision or control of any federal agency.

2.   SAME—Allotted Land—Rights of Heirs. The language of the proviso to section 9 of said act (Act May 27, 1908, c. 199, 35 Stat. 315), "that no conveyance of any interest of any full-blood Indian heir in such land shall be valid unless approved by the court

having jurisdiction of the settlement of the estate of said deceased allottee," excepts lands inherited by full-blood heirs from the genetral terms of the statute making the death of an allottee operate to remove all restrictions upon the alienation of said allottee's land.

3.   INDIAN LAND. The power to tax inherited Indian land is coincident with and dependent upon the removal of restrictions upon alienation; and, prior to the approval of conveyances of full-blood Indian heirs under the provisions of said act by the proper court, the power to tax said lands does not exist.

(Syllabus by the Court.)

*Error from District Court, Seminole County;*
*Tom D. McKeown, Judge.*

Action by Sallie Marcy against the Board of County Commissioners of Seminole County and others. Judgment for defendants, and plaintiff brings error. Reversed and remanded.

*James E. Gresham* and *J. H. Miley,* for plaintiff in error.

*C. L. Hill* and *Orivig & Cobb,* for defendants in error.

BLEAKMORE, J. This action was instituted in the court below to annul and cancel certain tax sale certificates, and restrain the collection of taxes assessed in the years 1910 and 1911 for county, township, and school district purposes against lands, exclusive of homestead, allotted to a full-blood member of the Seminole Tribe of Indians inherited by his full-blood heir upon his death in the month of February, 1910, the title to which land still remains in such heir. The trial court sustained a demurrer to the petition, holding that said lands were the subject of taxation; and the plaintiff brings the case here for review. The lands in question were allotted and their status fixed under a treaty of December 16, 1897, between the United States and the Seminole Nation and subsequent acts of Congress, the pertinent provisions of which are:

By the terms of the treaty of December 16, 1897, 30 Stat. 567 it is provided:

"All contracts for sale, disposition, or encumbrance of any

part of any allotment made prior to date of patent shall be void. * * * Each allottee shall designate one tract of forty acres, which shall, by the terms of the deed, be made inalienable and nontaxable as a homestead in perpetuity."

Section 8 of the appropriation act of March 3, 1903 (32 Stat. 1008, c. 994), provides:

"That the tribal government of the Seminole Nation shall not continue longer than March fourth, nineteen hundred and six: Provided, that the Secretary of the Interior shall at the proper time furnish the principal chief with blank deeds necessary for all conveyances mentioned in the agreement with the Seminole Nation contained in the act of July first, eighteen hundred and ninety-eight (Thirtieth Statutes, page five hundred and sixty-seven), and said principal chief shall execute and deliver said deeds to the Indian allottees as required by said act, and the deeds for allotment, when duly executed and approved, shall be recorded in the office of the Dawes Commission prior to delivery and without expense to the allottee until further legislation by Congress, and such records shall have like effect as other public records; provided further, that the homestead referred to in said act shall be inalienable during the lifetime of the allottee, not exceeding twenty-one years from the date of the deed for the allotment. A separate deed shall be issued for said homestead, and during the time the same is held by the allottee it shall not be liable for any debt contracted by the owner thereof."

Section 19 of the act of Congress approved April 26, 1906 (34 Stat. 144, c. 1876), provides:

"That no full-blood Indian of the Choctaw, Chickasaw, Cherokee, Creek or Seminole Tribes shall have power to alienate, sell, dispose of, or encumber in any manner any of the lands allotted to him for a period of twenty-five years from and after the passage and approval of this act, unless such restriction shall, prior to the expiration of said period, be removed by act of Congress. * * * Provided further, that all lands upon which restrictions are removed shall be subject to taxation, and the other lands shall be exempt from taxation as long as the title remains in the original allottee."

And by section 22 of the same act:

"That the adult heirs of any deceased Indian of either of the Five Civilized Tribes whose selection has been made, or to whom a deed or patent had been issued for his or her share of the land of the tribe to which he or she belongs or belonged, may sell and convey the lands inherited from such decedent; and if there be both adult and minor heirs of such decedent, then such minors may join in a sale of such lands by a guardian duly appointed by the proper United States court for the Indian Territory. And in case of the organization of a state or territory, then by a proper court of the county in which said minor or minors may reside or in which said real estate is situated, upon an order of such court made upon petition filed by guardian. All conveyances made under this provision by heirs who are full blood Indians are to be subject to the approval of the Secretary of the Interior, under such rules and regulations as he may prescribe."

By act of Congress approved May 27, 1908 (35 Stat. 312, c. 199), it was enacted:

"That from and after sixty days from the date of this act, the status of the lands allotted heretofore or hereafter to allottees of the Five Civilized Tribes shall, as regards restrictions on alienation or encumbrance be as follows: * * *"

By section 9 of said act, it is provided:

"That the death of any allottee of the Five Civilized Tribes shall operate to remove all restrictions upon the alienation of said allottee's land; provided, that no conveyance of any interest of any full-blood Indian heir in such land shall be valid unless approved by the court having jurisdiction of the settlement of the estate of said deceased allottee."

Section 4 of said act provides:

"That all land from which restrictions have been or shall be removed shall be subject to taxation and all other civil burdens as though it were the property of other persons than allottees of the Five Civilized Tribes."

And by section 5 of the same act it is further provided:

"That any attempted alienation or incumbrance by deed, mortgage, contract to sell, power of attorney, or other instrument

or other method of incumbering real estate, made before or after the approval of this act, which affects the title of the land allotted to allottees of the Five Civilized Tribes prior to removal of restrictions therefrom,   *   *   *   shall be absolutely null and void."

The sole question determinative of this case is: Are lands allotted to a full-blood member of the Seminole Tribe of Indians, exclusive of his homestead, inherited at his death by his full-blood Indian heirs exempt from taxation while owned and held by such heirs?

In construing section 1 of the Enabling Act and section 6, art. 10 of the Constitution of Oklahoma, this court, in the case of *Gleason v. Wood,* 28 Okla. 502, 114 Pac. 703, held:

"The people of the state in the adoption of the terms of the Enabling Act, in effect, have disclaimed any right or authority to limit or affect the power of the government to make any law or regulation respecting Indians, their lands, property, or other rights which the government might have made, had the territory embracing the same not been created into a state, and has held as exempt the property of the Indians in accordance with the treaties or federal laws relating thereto during the force and effect of the same. So that the general laws relating to the taxation of all property within the state, for the purposes of state and municipal government under the provisions of the Enabling Act and the Constitution, were suspended from operating upon these lands so long as they were held inalienable and exempt from taxation by the laws of Congress. On Oklahoma coming in as a state, it yielded the right to the federal government to legislate as to this property, of either absolving it from taxation or, by removing the exemption, thereby bringing it within the operation of the general taxing system of the state."

In the cases of *Choate v. Trapp,* 224 U. S. 665, 32 Sup. Ct. 565, 56 L. Ed. 941, and *Gleason v. Wood,* 224 U. S. 679, 32 Sup. Ct. 571, 56 L. Ed. 947, it was held by the Supreme Court of the United States that the lands allotted to members of the Choctaw and Chickasaw Tribes of Indians were nontaxable by the state of Oklahoma for a specified period for the reason that such exemption from taxation was a property right vested in such allottees under

the provisions of the treaties between the United States and their respective tribes; and the same was also held as to the homestead allotments of members of the Creek Tribe of Indians in the case of *English v. Richardson et al.*, 224 U. S. 680, 32 Sup. Ct. 571, 56 L. Ed. 949. Those decisions, however, relate only to such lands during the lifetime of the allottee.

Without doubt Congress, in the absence of a valid prior grant vesting in an allottee and his heirs a property right of exemption from taxation, had the power to provide, as was done in the act of 1908, *supra,* that all restrictions upon alienation of lands allotted to a member of an Indian Tribe should be removed by his death, and that such lands should thereupon become taxable. In the exercise of this power, it was deemed proper by the terms of the proviso contained in section 9, *supra,* to protect a certain presumably helpless class of Indian heirs, to wit, full-bloods, from their own inexperience, weakness, and improvidence, by providing that no conveyance of the interests inherited by them in such lands should be valid unless approved by the authority designated in the act. This brings us to a consideration of the question as to whether restrictions upon alienation of allotted lands are, within the purview of said act, removed by the death of an allottee where such lands are inherited by full-blood Indian heirs, no conveyance of whose interests is valid unless approved by the proper court; that is to say, does the death of an allottee, itself, immediately remove all restrictions upon alienation of his allotment regardless of the power of his heirs to convey the same without the approval of the court?

While the term "alienation" has received a varied judicial construction, yet it is apparent that in the foregoing acts of Congress relative to Indian lands it is used as understood at common law, and intended to embrace only voluntary sales by those persons authorized thereby to convey such lands. To extend its meaning so as to include all known modes by which lands may be transferred and title divested without the consent of the owner would be to defeat the evident purpose of Congress and violate that canon

of construction requiring the court to find and declare the intention of the lawmakers.

"The word 'provided' means 'on condition.' *DeVitt v. Kauf-man County*, 27 Tex. Civ. App. 332, 66 S. W. 224. * * * The office of a proviso is to repeal or restrict the general language preceding it, not to enlarge the enacting clause. *Com. v. Charity Hosp.*, 199 Pa. 119, 48 Atl. 906; *Patterson v. Winn*, 24 U. S. [11 Wheat.] 380, 6 L. Ed. 500; *Van Reipen v. Jersey City,* 58 N. J. Law, 262, 33 Atl. 740; *State v. Browne,* 56 Minn. 269, 57 N. W. 659." *Brewer et al. v. Rust*, 20 Okla. 776, 95 Pac. 233.

The words "restrictions upon the alienation," as used in the act of May 27, 1908, *supra,* mean those restraints or limitations imposed by law upon the power of the owners of the land mentioned to voluntarily convey the same free from supervision or control of some agency designated by Congress.

With this interpretation in mind, from the language of the proviso, "that no conveyance of any interest of any full-blood Indian heir in such land shall be valid unless approved by the court having jurisdiction of the settlement of the estate," it is clear that the power to convey inherited lands by full-blood heirs was not conferred free from supervision and control of a federal agency. The county courts of this state are agencies designated by Congress to supervise and control all such conveyances. The Legislature of the state has authorized the county courts to act in such capacity by providing fees to be charged for the approval of deeds of such full-blood heirs; and this court, recognizing the importance of the exercise of superintendence and control by said courts over such conveyances, has provided rules and regulations governing their procedure therein.

In *Tiger v. Western Investment Co.,* 221 U. S. 286, 31 Sup. Ct. 578, 55 L. Ed. 738, the Supreme Court of the United States, in construing the provisions of the act of April 26, 1906, said:

"We think a consideration of this act and of subsequent legislation in *pari materia* therewith demonstrates the purpose of

Congress to require such conveyances by full-blood Indians to be approved by the Secretary of the Interior."

And:

"Coming now to section 22, the first part of that section gives the adult heirs of any deceased Indian of either of the Five Civilized Tribes power to sell and convey the inherited lands named, with certain provisions as to joining minor heirs by guardians in such sales. This part of the statute would enable full-blood Indians, as well as others, to convey such lands as adult heirs of any deceased Indian, etc.; but the last sentence of the section requires the conveyance made under this provision, that is, conveyances made by adult heirs of the character named in the first part of the section when full-blood Indians, to be subject to the approval of the Secretary of the Interior."

Again:

"Section 8 of the act of May 27, 1908 (35 Stat. 312, c. 199) provides: 'Sec. 8. That section 23 of the act entitled, "An act to provide for the final disposition of the affairs of the Five Civilized Tribes in the Indian Territory, and for other purposes," approved April 26, 1906, is hereby amended by adding, at the end of said section the words, "or a judge of a county court of the state of Oklahoma."' Section 9 of that act provides: 'Sec. 9. That the death of any allottee of the Five Civilized Tribes shall operate to remove all restrictions upon the alienation of said allottee's land: Provided, that no conveyance of any interest of any full-blood Indian heir in such land shall be valid unless approved by the court having jurisdiction of the settlement of the estate of said deceased allottee, etc.' The obvious purpose of these provisions is to continue supervision over the right of full-blood Indians to dispose of lands by will, and to require conveyances of interest of full-blood Indians in inherited lands to be approved by a competent court."

In *United States v. Shock* (C. C.) 187 Fed. 870, construing section 9 of the act of May 27, 1908, it was said by Judge Campbell of the United States District Court for the Eastern District of Oklahoma:

"It will therefore be seen that the provision making the death of the allottee operate to remove all restrictions upon the alienation

of his land is qualified by the further provisions: First, that the full-blood heirs of such allottee cannot dispose of their interests in such inherited lands without the approval of the court having jurisdiction of the settlement of the estate of the deceased allottee from whom the inheritance comes. * * * The requirement that the full-blood heirs shall not sell without the approval of the court having jurisdiction of the settlement of the estate of the deceased is merely substituting the court in place of the Secretary of the Interior, for the purpose of such approval, and is to that extent a restriction upon the sale of the land. * * * It follows that the interests of all full-bloods in inherited lands owned by them on March 1, 1909, were not taxable."

And this court in *Stout v. Simpson,* 34 Okla. 129, 124 Pac. 754, referring to said section, in an opinion by Sharp, C., held:

"This provision, upon compliance with its terms, obviously removed all remaining restrictions upon the right to alienate inherited land by a full-blood Seminole Indian. * * *"

From the language of the act "that all land from which restrictions have been or shall be removed shall be subject to taxation," it is clear that the power of the state to tax the lands in question is coincident with and dependent upon the unrestricted right of the owner to sell the same. The power to tax, and right to convey, are granted by the same act, become effective upon the same condition and at one and the same time; the former cannot exist without the latter.

It follows that restrictions upon the alienation of the lands involved are removed only upon compliance with the terms of the proviso requiring the approval of conveyances of full-blood heirs by the county court having jurisdiction of the settlement of the allottee's estate. This is a necessary condition precedent to the power of the state to subject such lands to taxation; and, not having been complied with, all proceedings for the purpose of enforcing collection of taxes on said lands are void.

The judgment of the trial court is reversed, and the cause remanded.

All the Justices concur, except KANE, C. J., absent and not participating.